IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| MITCHELL D. HERMAN,<br>Co-Trustee of the Laurence Herman Trust<br>1536 Live Oak Drive<br>Silver Spring, Maryland 20910<br><br>                Plaintiff,<br><br>                v.<br><br>ROBERT N. HERMAN,<br>7146 Huntington Lane, Apt. 21-303<br>Delray Beach, Florida 33446<br><br>and/or<br><br>5574 N Ocean Blvd, #23D<br>Ocean Ridge, Florida 33435-7042<br><br>                Defendant. | Civil Action No. _____<br><br><br>JURY TRIAL DEMANDED |

## **COMPLAINT**

Mitchell D. Herman ("Mitchell" or the "Plaintiff"), co-trustee of the Laurence Herman Trust (the "Larry Trust"), by undersigned counsel, brings this Complaint against Robert N. Herman ("Robert" or the "Defendant")[1], and alleges and states as follows:

## **PARTIES**

1. Plaintiff Mitchell Herman is a citizen and domiciliary of the State of Maryland having an address at 1536 Live Oak Drive, Silver Spring, Maryland 20190. Mitchell is a trustee of the Larry Trust.

---

[1] Mitchell and Robert Herman are brothers with the same last name. Accordingly, first names are used to refer to them herein. No disrespect is intended by this editorial convention.

2. Defendant Robert Herman is a citizen and domiciliary of the State of Florida having an address at 7146 Huntington Lane, Apt. 21-303, Delray Beach, Florida 33446 and/or 5574 N Ocean Blvd, Ocean Ridge, Florida 33435-7042.  Robert is also a trustee of the Larry Trust.

## JURISDICTION AND VENUE

3. The Court has original jurisdiction over this civil action pursuant to 28 U.S.C. § 1332 because the matter in controversy in this civil action exceeds $75,000, exclusive of interest and costs, and the Plaintiff and the Defendant are citizens of different states.

4. Venue is proper under 28 U.S.C. § 1391(b) because the Defendant resides in the Southern District of Florida.

## FACTS COMMON TO ALL COUNTS

5. Mitchell and Robert's father Kenneth Herman ("Kenneth") established the Larry Trust in 1988 for the benefit of Mitchell and Robert's brother, Laurence Herman ("Larry"), who was unable to work or provide for himself.

6. Kenneth formed the Larry Trust under Maryland law through the Irrevocable Trust Agreement for Benefit of Laurence S. Herman (the "Larry Trust Agreement"), a true and correct copy of which is attached hereto as **Exhibit "A"**.

7. Pursuant to the terms of the Larry Trust Agreement, the Larry Trust was to be operated for the benefit of Larry during his lifetime, with Larry entitled to the income from the Trust, and upon Larry's death, the Larry Trust was to wind down with its remaining assets to be equally distributed between three (3) beneficiaries, Mitchell, Robert, and their sister, Sandra Perkins.

8. When Kenneth created the Larry Trust, he designated Mitchell and Robert as co-trustees of the Larry Trust but personally oversaw the financial investments of the trust until his

death in 2012.  Upon Kenneth's death, Robert, who was a trustee of Kenneth's own trust and of a trust to benefit Robert's and Mitchell's stepmother, Rhoda Herman, took full control over all financial investment activities of the Larry Trust.  At the time of Kenneth's death, the Larry Trust, upon information and belief, contained more than ten million dollars ($10,000,000) in assets.

9. Prior to Kenneth's death in 2012, at least three separate financial institutions – Morgan Stanley Smith Barney LLC ("Morgan Stanley"), PNC Bank, and Bank of America – managed the Larry Trust's financial assets.

10. Following Kenneth's death in 2012, Robert consolidated financial control over the Larry Trust's assets in himself and sought to aggregate the securities owned by the Larry Trust in accounts maintained and managed by Morgan Stanley, and specifically under the control of Robert's close friend and Morgan Stanley employee, Sumitro Pal ("Mr. Pal").

11. In 2013, Robert started the process of aggregating the Larry Trust assets at Morgan Stanley, and the Larry Trust paid Morgan Stanley to manage, oversee, and handle those assets.

12. As part of the financial planning for the Larry Trust, Morgan Stanley maintained two brokerage accounts for the Larry Trust – a stock account, 530-XXX253-573, opened on July 14, 2004 (the "Stock Account") and a bond account, 530-XXX245-573, opened on May 17, 2006 (the "Bond Account" and, collectively with the Stock Account, the "Trust Accounts").

13. When Mitchell learned that Robert, following Kenneth's death, was taking steps to consolidate the investment assets of the Larry Trust in Morgan Stanley, Mitchell demanded Morgan Stanley and Robert agree that, among other things, Morgan Stanley would consult with, and obtain the agreement of, both co-trustees, Mitchell and Robert, before taking any action with respect to the Larry Trust assets.

3

14. Mitchell only learned of Robert's unilateral efforts to consolidate the Larry Trust assets at Morgan Stanley because PNC Bank required both Robert's and Mitchell's consent to transfer Larry Trust assets from PNC accounts to Morgan Stanley.

15. Mitchell also demanded that Morgan Stanley consult with and obtain both co-trustees's agreement with respect to actions in the Larry Trust because Mitchell knew that Robert had a close relationship with Mr. Pal and maintained significant non-Larry Trust assets under management by Morgan Stanley and its employees and agents (particularly Mr. Pal). Mitchell, therefore, sought to ensure that Robert and Morgan Stanley took actions in the Trust Accounts that were in the best interests of the Larry Trust and only with Mitchell's knowledge and approval.

16. In response to Mitchell's demands, Morgan Stanley and Robert promised and agreed that they would consult with, and obtain the agreement of, both co-trustees before Morgan Stanley took any action with respect to the Trust Accounts. Morgan Stanley, Robert, and Mitchell memorialized this agreement in a letter dated May 15, 2013 (the "Morgan Stanley 2013 Letter") in which Morgan Stanley, acting through Vice President and "Complex Risk Officer" Cassandra Dunwell, "confirm[ed] that moving forward both trustees will be consulted prior to engaging in any securities transactions in the [Trust Accounts]." Morgan Stanley 2013 Letter (a true and correct copy is attached hereto as **Exhibit "B"**).

17. As described in greater detail below, notwithstanding Robert's and Morgan Stanley's agreement, neither Robert nor Morgan Stanley ever obtained Mitchell's consent for the many trades Robert made or caused to be made in the Trust Accounts.

18. Under the agreement between Mitchell, Robert, and Morgan Stanley, neither Robert nor Mitchell was to direct and/or command action in the Trust Accounts without the consent of the other co-trustee.[2]

19. Robert, nevertheless, since 2012, failed and refused to obtain Mitchell's consent for numerous actions Robert unilaterally took using the assets of the Larry Trust.

20. Indeed, despite Mitchell's repeated requests for accountings and information concerning Robert's unilateral actions regarding the Larry Trust's assets, Robert has refused to provide Mitchell with information or accountings to enable Mitchell to follow or understand Robert's actions with respect to the substantial assets and financial dealings of the Larry Trust.

21. After Robert and Morgan Stanley agreed, in 2013, to only act in the Larry Trust based on the consent of both co-trustees, Morgan Stanley created an understood financial plan for the Larry Trust aimed at preserving the Larry Trust's value for its beneficiary. This was particularly important because that beneficiary, Larry, was unable to care for himself and entirely dependent on the Larry Trust to fund his medical, living, and other expenses.

22. Despite their agreement with Mitchell, Morgan Stanley executed trades in the Trust Accounts based on Robert's sole direction and command, without the knowledge or approval of Mitchell.

23. Notwithstanding the agreement set forth in the Morgan Stanley 2013 Letter, and notwithstanding Robert's duties under the Trust Agreement, from 2014 through 2017, Morgan Stanley, without the knowledge or approval of Mitchell, and at the sole direction and command of Robert, executed trades that were unsuitable, risky, and questionable when reviewed against the

---

[2] Robert, in fact, admits in various filings made in arbitrations and in open court in Maryland that Maryland law, which governs the Larry Trust, "unequivocally requires" the consent of both co-trustees for the Larry Trust to act in most circumstances.

financial plan, parameters, and purpose of the Larry Trust, and which trades, upon information and belief, led to losses of over $1.6 million in the Bond Account.

24. Notwithstanding the financial management principles established for the Larry Trust, Robert's promise and agreement to obtain Mitchell's approval for any and all trades in the Trust Accounts, and Robert's knowledge that he and Mitchell must act in unison in these matters, most, if not all, of the bonds Morgan Stanley purchased for the Bond Account at Robert's direction (and without Mitchell's prior knowledge or approval), were graded as "junk" rather than "investment" grade bonds.

25. Because the Larry Trust is not an institutional investor, "junk" bonds were an extremely risky investment for the Bond Account and inconsistent with the financial plan, investment parameters, and purpose of the Larry Trust.

26. As a result, Robert placed great, unnecessary risk on the account by directing and commanding Morgan Stanley to make such trades. Ultimately Robert's unilateral actions in causing the Larry Trust to assume these inappropriate risks resulted in losses equaling or exceeding $1.6 million.

27. In addition to the improper junk bond investments and trades, Morgan Stanley, at the sole direction and command of Robert, and without the knowledge or consent of Mitchell, executed trades in the Stock Account from 2015 through 2017 that were risky and questionable when reviewed against the financial plan, investment parameters, and purpose of the Larry Trust. These questionable stock trades included trades on margin.

28. Throughout the time that Robert was unilaterally directing Morgan Stanley to make the trades, Mitchell was repeatedly asking Robert to give Mitchell information about what Robert was doing with the assets of the Larry Trust. Throughout this time, Mitchell also asked for an

accounting of Robert's activity as co-trustee of the Larry Trust.  Robert refused to give Mitchell any of this information and refused to provide Mitchell with the requested accountings, telling Mitchell at one point that this information was "on a need to know basis, and you [referring to Mitchell] do not need to know."

29. In February 2018, Mr. Pal committed suicide.  Upon information and belief, at the time Mr. Pal committed suicide, he was under investigation for or suspicion of financial impropriety involving Robert and/or other individuals, including, without limitation, an individual named Nirav Babu.

30. On October 19, 2018, several months after Mr. Pal committed suicide while being, upon information and belief, under investigation of financial impropriety involving Robert and/or other individuals, Morgan Stanley informed Mitchell by letter that it was terminating its relationship with, and management of, the Larry Trust and the Trust Accounts.  *See* October 19, 2018 Letter (the "October 19 Letter") attached as **Exhibit "C"**.

31. Upon further inquiry by Mitchell, who was surprised by this development, Morgan Stanley informed Mitchell that for reasons it declined to state, Morgan Stanley was ceasing all business with any account associated with Robert and Robert's immediate family.  Other than terminating its relationship with the Larry Trust and the Trust Accounts, which Robert was directly involved with as a co-trustee of the Larry Trust, Morgan Stanley specifically told Mitchell that Mitchell was welcome to keep his personal and other accounts at Morgan Stanley as long as the accounts Mitchell kept at Morgan Stanley did not have any connection with Robert or Robert's immediate family.

32. Although Mr. Pal's suicide alarmed Mitchell, Mitchell did not learn until much later that in November 2018, a few months after Mr. Pal's suicide and just weeks after Morgan Stanley

terminated its relationship with Robert and Robert's immediate family, Robert brought a lawsuit against Mr. Pal's widow alleging that, beginning in about 2014, Mr. Pal, working with Nirav Babu, stole and misappropriated funds from Robert and his wife's Morgan Stanley accounts through investments involving Nirav Babu and/or his businesses.

33. On October 15, 2019, Robert settled the lawsuit against Mr. Pal's widow for a payment of $875,000 (the "Pal Settlement"). In exchange for the Pal Settlement, Robert and his wife agreed

> for themselves, individually, and without limitation, for all of their agents, representatives, affiliates, successors, heirs and assigns, to unconditionally and irrevocably release, remise and forever discharge [Mr. Pal's widow] from any and all suits, claims, . . . of any nature whatsoever, whether presently known or unknown from the dawn of time and through the date of the execution of this Agreement, including, without limitation, all claims or causes of action arising out of or related to the underlying dispute in the Lawsuit . . . .

Notwithstanding Mr. Pal having provided services to the Larry Trust and other Herman family trusts, Robert did not share any portion of the Pal Settlement with the Larry Trust or any other Herman family trust.

34. In 2018, Robert and his wife also brought an arbitration proceeding, FINRA Case No. 18-03880, against Morgan Stanley ("Arbitration 18-03880"). Upon information and belief, Arbitration 18-03880 related to Mr. Pal's and/or Morgan Stanley's alleged mismanagement and investment and/or use of Robert and his wife's assets in business dealings with Nirav Babu and/or other individuals and/or their respective businesses. Morgan Stanley responded to Robert's arbitration complaint by bringing their own claims against Nirav Babu and Robert's son, Matthew Herman.

35. Upon information and belief, Robert and his wife settled Arbitration 18-03880 against Morgan Stanley on February 5, 2021 for an unknown amount (the "18-03880 Settlement"). In exchange for the 18-03880 Settlement, Robert and his wife, on behalf of themselves and their

agents, heirs, executors, administrators, predecessors, successors, assigns, representatives, and trustees (collectively, the "Releasors")

> fully and forever release and discharge Morgan Stanley . . . from any and all claims, demands, actions, causes of action, contracts, obligations, suits, debts, costs or liabilities, whether known or unknown, which Releasors ever had, now have, or may hereafter claim to have, against [Morgan Stanley] on or before the last date of execution of this Agreement. This general release includes any such rights, claims, or causes of action relating to, arising out of, brought in, or that could have been brought in, the Action, or that relate in any way to dealings of any kind between Releasors and [Morgan Stanley] on or before the last date of execution of this Agreement.

36.  Upon information and belief, Robert, on behalf of himself, his family, and/or trusts of which he is a trustee, received almost $6 million in settlement payments from Morgan Stanley in connection with Mr. Pal's and/or Morgan Stanley's investment activities and/or Nirav Babu (collectively with the Pal Settlement and the 18-03880 Settlement, the "Robert Herman Settlements").

37.  Robert never informed Mitchell of his concerns regarding Morgan Stanley, Mr. Pal, or Nirav Babu, nor, to Mitchell's knowledge, did Robert seek to pursue any claims the Larry Trust had against Morgan Stanley or Mr. Pal. Similarly, upon information and belief, Robert never sought to pursue any claims any of the other Herman family trusts he oversaw (except, perhaps, those of his immediate family) might have against Morgan Stanley or Mr. Pal. Robert never shared any portion of the Robert Herman Settlements with the Larry Trust or any other Herman family trust (except, perhaps, those of his immediate family).

38.  Upon information and belief, in light of Robert's potential involvement in the financial impropriety that may have led Mr. Pal to commit suicide, in 2018, Morgan Stanley terminated lines of credit that Robert unilaterally and improperly collateralized with the assets of other Herman family trusts.

39. Because he was never asked for his consent, Mitchell is unaware whether Robert and/or Mr. Pal used the Larry Trust as collateral for similar lines of credit.

40. Robert's unauthorized use of the Larry Trust assets as collateral would constitute yet another breach by Robert of (i) his agreement with Mitchell and Morgan Stanley, (ii) his obligations under the Trust Agreement, and (iii) his fiduciary duties.

41. Despite the fact that Robert, in breach of the Morgan Stanley 2013 Letter (*see* **Exhibit B**), unilaterally entrusted the Larry Trust's assets to Morgan Stanley and Mr. Pal, and despite the fact that Robert personally pursued and recovered a substantial settlement allegedly for his own claims against Morgan Stanley and Mr. Pal on account of alleged impropriety, Robert retained the entirety of the Robert Herman Settlements personally and never informed Mitchell of the settlements' existence, nor did he share any portion of the settlement proceeds with either the Larry Trust.

42. Despite the fact that Robert owed a fiduciary duty to pursue any claims the Larry Trust had against Morgan Stanley and Mr. Pal, Robert never pursued claims on behalf of the Larry Trust against Morgan Stanley or Mr. Pal even though, upon information and belief, Mr. Pal would have used or invested Larry Trust assets in the same manner he used or invested assets of Robert's personal trusts.

43. In light of Robert's failure to pursue Morgan Stanley for the losses occasioned by Mr. Pal's acceptance of Robert's unilateral investment directions, in July 2020, Mitchell, as co-trustee and on behalf of the Larry Trust, filed an arbitration against Morgan Stanley before the Financial Industry Regulatory Authority ("FINRA") to recover the losses in the Trust Accounts (the "FINRA Arbitration") occasioned by Morgan Stanley's, Mr. Pal's, and Robert's wrongdoing.

44.  Mitchell did not, and could not, bring claims against Robert directly in the FINRA Arbitration because no arbitration agreement exists between Robert and Mitchell.

45.  Robert has gone to extraordinary lengths to hinder, delay, and prevent Mitchell from pressing the FINRA Arbitration against Morgan Stanley.

46.  On October 14, 2020, while the 18-03880 Arbitration was still pending, Morgan Stanley answered Mitchell's statement of claim in the FINRA Arbitration and filed a cross-claim against Robert seeking indemnification for any amounts Morgan Stanley is required to pay Mitchell in the FINRA Arbitration.

47.  On January 19, 2021, Robert answered Morgan Stanley's cross-claim by asserting, among other things, that the FINRA arbitrators should dismiss the FINRA Arbitration because Robert did not consent to Mitchell filing the Arbitration on the Larry Trust's behalf.

48.  Upon information and belief, during the same timeframe that Robert argued for dismissal of the FINRA Arbitration against Morgan Stanley, Robert and Morgan Stanley negotiated and executed their own confidential settlement agreement for the 18-03880 Arbitration that, upon information and belief, resulted in Morgan Stanley's payment to Robert of an unknown sum to settle Robert's personal claims.

49.  Just ten days after arguing for the FINRA Arbitration's dismissal, on January 29, 2021, Robert and his wife signed the settlement agreement resolving the 18-03880 Arbitration and granting Morgan Stanley a general release of "all rights, claims, or causes of action relating to, arising out of, brought in, or that could have been brought in, the [18-03880 Arbitration], or that relate in any way to dealings of any kind between Releasors and [Morgan Stanley] on or before the last date of execution of th[e] Agreement."

50. On February 10, 2021, just twelve (12) days after signing the settlement agreement for the 18-03880 Arbitration and only three weeks after Robert argued for dismissal of the FINRA Arbitration, Robert commenced an action against Mitchell in Maryland state court ("Robert's First State Court Action") seeking to remove Mitchell as co-trustee of the Larry Trust.

51. If Robert were to prevail in Robert's First State Court Action, he would be the sole remaining trustee of the Larry Trust and could unilaterally dismiss the FINRA Arbitration.

52. According to Robert (who had just reached a confidential settlement with Morgan Stanley and who, upon information and belief, had settled other claims relating to Mr. Pal's, Mr. Babu's, and Morgan Stanley's investment activities for $6 million), Mitchell was wasting the Larry Trust's assets by pursuing the FINRA Arbitration.  Upon information and belief, one of the main reasons Robert brought Robert's First State Court Action was so that he could dismiss the FINRA Arbitration.

53. On October 7, 2021, after Robert's First State Court Action failed to result in a quick dismissal of the FINRA Arbitration, Robert specifically moved within the FINRA Arbitration to have the FINRA arbitrators dismiss the Arbitration ("Robert's Motion to Dismiss") on the alleged basis that Mitchell could not unilaterally pursue that proceeding against Morgan Stanley.

54. On September 8, 2022, with Robert's Motion to Dismiss still pending before the FINRA arbitrators, Robert brought yet another action against Mitchell in Maryland state court ("Robert's Second State Court Action") seeking to stay the FINRA Arbitration on virtually identical grounds to those originally raised in Robert's Motion to Dismiss.

55. On November 3, 2022, after FINRA held a hearing in which Robert (through counsel) participated and had a full opportunity to argue his position, the FINRA arbitrators denied Robert's Motion to Dismiss.

56. As of the filing of this Complaint, Robert's Second State Court Action, which asserts arguments essentially identical to those raised in Robert's Motion to Dismiss, remains pending, subject to the Maryland court's decision of Mitchell's motion to dismiss that case given Robert's agreement to present his dismissal arguments to the FINRA arbitrators for decision.

57. Robert's significant efforts to block the FINRA Arbitration and prevent his co-trustee from pursuing legitimate claims on the Larry Trust's behalf constitute additional breaches of Robert's obligations under the Trust Agreement and additional breaches of Robert's fiduciary duties as co-trustee of the Larry Trust.

58. Upon information and belief, Robert's numerous actions and repetitive filings seeking to block the FINRA arbitration are, among other things, an attempt by Robert to remove Mitchell as co-trustee and prevent Mitchell from investigating and recovering on the losses the Larry Trust incurred as a result of Robert's bad acts.

59. Although discovery is not yet complete in Robert's First State Court Action or the FINRA Arbitration, the limited discovery Mitchell received so far yielded very few details of Robert's action against Morgan Stanley and the terms of the Robert Herman Settlement, largely due to Robert's refusal to produce any information regarding the claims he pursued against Morgan Stanley and/or a copy of the settlement agreement.

60. The scant information provided in discovery, coupled with Robert's refusal to be transparent and his extraordinary actions to prevent Mitchell from pursuing the Larry Trust's valuable claims against Morgan Stanley, has made it clear that Robert was not an unwitting dupe in his dealings with Morgan Stanley.

61. Robert's actions in seeking to block Mitchell from being able to pursue Morgan Stanley to recover the significant losses the Larry Trust suffered indicate Robert intentionally

misused the assets of the Larry Trust for his own benefit and that Robert is now using legal process to seek to stop Mitchell from uncovering Robert's bad acts.

62. Robert's intentional misuse of the Larry Trust's assets for his own benefit, and attempts to stop his co-trustee from pursuing legitimate claims for the benefit of the Larry Trust constitute additional breaches of Robert's obligations under the Trust Agreement and additional breaches of Robert's fiduciary duties as co-trustee of the Larry Trust.

## COUNT I
## BREACH OF CONTRACT

63. Plaintiff realleges and incorporates herein the allegations in Paragraphs 1 through 62 above as if fully set forth herein.

64. By accepting their appointment as Co-Trustees of the Trust, both Mitchell and Robert agreed to be bound by the general rule in Maryland that co-trustees must act in unison.

65. Morgan Stanley agreed with Mitchell and Robert that it would only accept investment instructions and initiate trades after it consulted with and obtained the consent of both Mitchell and Robert. Robert understood that Morgan Stanley's agreement precluded him from directing or commanding actions within the Larry Trust and the Trust Accounts without the knowledge and consent of Mitchell.

66. A condition of allowing Robert to aggregate the Larry Trust assets with Morgan Stanley in 2012 and 2013 was that Robert would obtain Mitchell's consent when trading the Larry Trust's investment assets.

67. In reliance on Robert's promise to only act with respect to the Larry Trust's investment assets with Mitchell's consent, Mitchell agreed to aggregate those assets with Morgan Stanley and allowed Morgan Stanley to manage the Trust Accounts.

68. Notwithstanding his promise, Robert directed, commanded, and/or allowed Morgan Stanley, acting through Mr. Pal and others, to execute numerous high risk and questionable trades in the Trust Accounts, including trades on margin.

69. Robert's actions breached his agreement with Mitchell.

70. As a direct and proximate result of Robert's breach of this agreement, the Larry Trust has suffered substantial damages in an amount equaling or exceeding $1.6 million.

## COUNT II
## BREACH OF FIDUCIARY DUTY

71. Plaintiff realleges and incorporates herein the allegations in Paragraphs 1 through 70 as if fully set forth herein.

72. As a trustee of the Larry Trust, Robert owed a fiduciary duty to the trust and its beneficiaries, including Mitchell.

73. A trustee is required to administer the trust in good faith, in accordance with the trust's terms and purposes and the interests of the beneficiaries. *See* Md. Code, Estates & Trusts § 14.5-801.

74. As a fiduciary, a trustee has the duty to administer the trust diligently and solely for the benefit, and in the interests, of the beneficiaries. Md. Code, Estates & Trusts § 14.5-802(a).

75. A fiduciary is obligated to invest and manage investment assets as a prudent investor would considering the purposes, terms, distribution requirements, and other circumstances of the trust. *See* Md. Code, Estates & Trusts § 14.5-804.

76. A trustee shall take reasonable steps to take control of and protect the trust property. Md. Code, Estates & Trusts § 14.5-809.

77. Robert breached his fiduciary duties to the Larry Trust, his co-trustee, and the trust's beneficiaries by, among other things, (i) without Mitchell's consent, using the Larry Trust's assets

to execute risky and questionable trades, including trading on margin; (ii) without Mitchell's consent, using the Larry Trust's assets to trade "junk" bonds even though the Bond Account was an individual portfolio, which, unlike an institutional portfolio, was unsuitable for "junk" bonds; (iii) failing to pursue the Larry Trust's claims against Morgan Stanley or Mr. Pal while pursuing and settling his personal claims and those of other trusts against them; and (iv) hiding his improprieties, and wasting Larry Trust assets, by preventing Mitchell from pursuing the Larry Trust's claims against Morgan Stanley.

78. As a direct result of Robert's breaches of fiduciary duty, the Larry Trust suffered substantial harm and damages, including losses of at least $1.6 million from Robert's improper and unauthorized bond and stock trades and thousands of dollars in attorneys' fees and costs from Robert's actions to prevent Mitchell from pursuing the Larry Trust's claims.

## COUNT III
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

79. Plaintiff realleges and incorporates herein the allegations in Paragraphs 1 through 78 as if fully set forth herein.

80. Robert knew that Morgan Stanley contractually agreed with Mitchell that Morgan Stanley would not execute trade transactions in the Larry Trust without the knowledge and authorization of both trustees.

81. Notwithstanding his knowledge of Morgan Stanley's contract with Mitchell, Robert induced Morgan Stanley to breach its agreement with Mitchell.

82. As a result of Robert's actions in inducing Morgan Stanley to breach its contract with Mitchell and accept trade instructions solely authorized by Robert, the Larry Trust suffered millions of dollars in losses.

## COUNT IV
## DECLARATORY JUDGMENT

83. Plaintiff realleges and incorporates herein the allegations in Paragraphs 1 through 82 as if fully set forth herein.

84. Through his various efforts to prevent Mitchell from pursuing the Larry Trust's claims against Morgan Stanley, Robert has depleted the Larry Trust of thousands of dollars in legal fees.

85. Robert has asserted, in writing, that the Larry Trust is responsible for paying any legal fees or other monies that Robert is required to pay on account of any claim asserted against him by Morgan Stanley and/or Mitchell related to Robert's breaches of fiduciary duty.

86. The Maryland Uniform Declaratory Judgments Act, Maryland Code § 3–401 et seq. of the Courts & Judicial Proceedings Article ("C.J."), provides that "a court of record within its jurisdiction may declare rights, status, and other legal relations whether or not further relief is or could be claimed." C.J. § 3–403(a). *120 W. Fayette St., LLLP v. Mayor & City Council of Baltimore City*, 413 Md. 309, 355 (2010).

87. Neither Maryland law nor the Larry Trust allow a trustee to breach her/his fiduciary duty, waste the trust assets, and then use those same assets to pay for the trustee's liabilities when the trustee is found to have engaged in a breach of trust.

88. Mitchell disputes that Robert is entitled to utilize the Larry Trust assets to pay for the defense of and/or liability for any breaches of fiduciary duty in which he is found to have engaged.

89. There is a ripe and actual controversy between Mitchell and Robert regarding whether Maryland law and/or the Larry Trust entitle Robert to use Larry Trust assets to pay for liabilities for which Robert is found responsible due to a breach of his fiduciary duty.

**DEMANDS FOR RELIEF**

WHEREFORE, for the foregoing reasons, Plaintiff Mitchell Herman respectfully requests that the Court enter an Order:

A.  entering judgment on Count I or, in the alternative, on Count III against Defendant and in favor of Plaintiff in an amount to be determined at trial, but in any event not less than $1.6 million;

B.  entering judgment on Count II against Defendant and in favor of Plaintiff in an amount to be determined at trial, but in any event not less than $1.6 million;

C.  also entering judgment on Count II against Defendant and in favor of Plaintiff in an amount to be determined at trial equal to (i) the time value of the monies owed by Robert to Mitchell and the Trust as a result of their reliance on Robert and the breach of fiduciary duty owed by Robert; (ii) the costs of suit incurred by Plaintiff in asserting and prosecuting this civil action, including reasonable attorneys' fees and all other fees, costs, and expenses associated with this case; and (iii) punitive or exemplary damages appropriate for breach of fiduciary duty by Robert to Mitchell and the Trust;

D.  On Count IV, declaring that Robert is not entitled to use Larry Trust assets to pay any liabilities associated with the judgments entered under Counts I (or, in the alternative, III) and II and requiring Robert to repay to the Larry Trust any and all attorneys fees paid to defend Robert in this action;

E.  On all Counts, granting Plaintiff an award of prejudgment and post-judgment interest on any monetary award in this action;

F. On all Counts, granting Plaintiff judgment against Defendant in the amount of the costs of suit incurred by Plaintiff in asserting and prosecuting this civil action, including reasonable attorneys' fees and all other fees, costs, and expenses associated with such this case; and

G. On all Counts, granting Plaintiff such other and further relief as this Court deems just and proper.

## RESERVATION OF RIGHT TO AMEND

Mitchell Herman reserves the right to amend his claims if more information becomes available, including information obtained through discovery from Robert Herman.

Dated: December 28, 2022   **TAYMAN LANE CHAVERRI LLP**

/s/ Katie Lane Chaverri
Katie Lane Chaverri, (Bar No. 595985)
David Lee Tayman (to be admitted pro hac vice)
Jason D. Wallach (to be admitted pro hac vice)
Tayman Lane Chaverri LLP
2001 L Street NW, Suite 500
Washington, D.C. 20036
(202) 695-8146 (telephone)
(202) 478-2781 (facsimile)
kchaverri@tlclawfirm.com
dtayman@tlclawfirm.com
jwallach@tlclawfirm.com

*Counsel for Plaintiff Mitchell D. Herman*